UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

JOSEPH DUFRESNE,

                Plaintiff,

    v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

                Defendant.

NO. C17-5101-JPD

ORDER REVERSING AND
REMANDING TO THE
COMMISSIONER

Plaintiff Joseph Dufresne appeals the final decision of the Commissioner of the Social

Security Administration ("Commissioner") which denied his application for Supplemental

Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f,

after a hearing before an administrative law judge ("ALJ"). For the reasons set forth below,

the Commissioner's decision is REVERSED and REMANDED.

## I.      FACTS AND PROCEDURAL HISTORY

At the time of the administrative hearing, plaintiff was a forty-year old man with a high

school education and one year of college. Administrative Record ("AR") at 46. His past work

experience includes employment as an office worker for a check guaranty company, a sweeper

at a plant processing place, and labor positions through temporary agencies. AR at 47-49, 60-

61. Plaintiff was last gainfully employed by temporary agencies in 2013. AR at 51, 61.

On February 3, 2014, plaintiff filed a claim for SSI payments, alleging an onset date of June 1, 2009.  AR at 167-72.  Plaintiff asserts that he is disabled due to cellulitis of the right leg, tibia fibula surgery, compartment syndrome, obstructive sleep apnea, irritable bowel syndrome, blood clots, hypertension, psoriasis, bipolar disorder, autism, persistent depressive disorder, attention deficient hyperactivity disorder, anxiety disorder, and Tourette's Syndrome.  AR at 42-43, 55, 75.

The Commissioner denied plaintiff's claim initially and on reconsideration.  AR at 74-102.  Plaintiff requested a hearing, which took place on January 12, 2016.  AR at 38-73.  On February 5, 2016, the ALJ issued a decision finding plaintiff not disabled and denied benefits based on his finding that plaintiff could perform a specific job existing in significant numbers in the national economy.  AR at 15-33.  Plaintiff's request for review was denied by the Appeals Council, AR at 1-6, making the ALJ's ruling the "final decision" of the Commissioner as that term is defined by 42 U.S.C. § 405(g).  On February 14, 2017, plaintiff timely filed the present action challenging the Commissioner's decision.  Dkt. 3.

## II.     JURISDICTION

Jurisdiction to review the Commissioner's decision exists pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## III.     STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court may set aside the Commissioner's denial of social security benefits when the ALJ's findings are based on legal error or not supported by substantial evidence in the record as a whole.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 (9th Cir. 2005).  "Substantial evidence" is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Magallanes v. Bowen*, 881 F.2d 747, 750

(9th Cir. 1989). The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving any other ambiguities that might exist. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). While the Court is required to examine the record as a whole, it may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). When the evidence is susceptible to more than one rational interpretation, it is the Commissioner's conclusion that must be upheld. *Id.*

The Court may direct an award of benefits where "the record has been fully developed and further administrative proceedings would serve no useful purpose." *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002) (citing *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996)). The Court may find that this occurs when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting the claimant's evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled if he considered the claimant's evidence.

*Id.* at 1076-77; *see also Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000) (noting that erroneously rejected evidence may be credited when all three elements are met).

## IV. EVALUATING DISABILITY

As the claimant, Mr. Dufresne bears the burden of proving that he is disabled within the meaning of the Social Security Act (the "Act"). *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (internal citations omitted). The Act defines disability as the "inability to engage in any substantial gainful activity" due to a physical or mental impairment which has lasted, or is expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is disabled under the Act only if his impairments are of such severity that he is unable to do his previous work, and cannot, considering his age,

education, and work experience, engage in any other substantial gainful activity existing in the national economy. 42 U.S.C. §§ 423(d)(2)(A); *see also Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

The Commissioner has established a five step sequential evaluation process for determining whether a claimant is disabled within the meaning of the Act. *See* 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden of proof during steps one through four. At step five, the burden shifts to the Commissioner. *Id.* If a claimant is found to be disabled at any step in the sequence, the inquiry ends without the need to consider subsequent steps. Step one asks whether the claimant is presently engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b).[1] If he is, disability benefits are denied. If he is not, the Commissioner proceeds to step two. At step two, the claimant must establish that he has one or more medically severe impairments, or combination of impairments, that limit his physical or mental ability to do basic work activities. If the claimant does not have such impairments, he is not disabled. 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant does have a severe impairment, the Commissioner moves to step three to determine whether the impairment meets or equals any of the listed impairments described in the regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d). A claimant whose impairment meets or equals one of the listings for the required twelve-month duration requirement is disabled. *Id.*

When the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, the Commissioner must proceed to step four and evaluate the claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e). Here, the

---

[1] Substantial gainful activity is work activity that is both substantial, i.e., involves significant physical and/or mental activities, and gainful, i.e., performed for profit. 20 C.F.R. § 404.1572.

Commissioner evaluates the physical and mental demands of the claimant's past relevant work to determine whether he can still perform that work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If the claimant is able to perform his past relevant work, he is not disabled; if the opposite is true, then the burden shifts to the Commissioner at step five to show that the claimant can perform other work that exists in significant numbers in the national economy, taking into consideration the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 416.920(g); *Tackett*, 180 F.3d at 1099, 1100. If the Commissioner finds the claimant is unable to perform other work, then the claimant is found disabled and benefits may be awarded.

## V.     DECISION BELOW

On February 5, 2016, the ALJ issued a decision finding the following:

1. The claimant has not engaged in substantial gainful activity since February 3, 2014, the application date.

2. The claimant has the following severe impairments: attention deficit hyperactivity disorder ("ADHD"); major depressive disorder; anxiety disorder; Tourette's syndrome; obesity; and right foot and ankle pain secondary to compartment syndrome.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except the claimant should never climb ladders, ropes, and scaffolds, but he can occasionally climb ramps and stairs; occasionally stoop, kneel, crouch, and crawl; frequently balance; he is limited to occasional exposure to temperature extremes, to humidity, and to pulmonary irritants such as dust, fumes, odors, gases, and poor ventilation; he is limited to occasional exposure to hazardous working conditions such as proximity to unprotected heights and moving machinery; the claimant is capable of understanding, recalling and carrying out simple tasks and instructions as well as routine and familiar semi-complex tasks, but would have difficulty with recall and performance of novel complex or detailed tasks; and he is limited to occasional physical interaction with the

general public, but he is able to interact without limitation in a remote setting, such as by telephone or on-line.

5. The claimant is unable to perform any past relevant work.

6. The claimant was born on XXXXX, 1976 and was 38 years old, which is defined as a younger individual age 18-44, on the date the application was filed.[2]

7. The claimant has at least a high school education and is able to communicate in English.

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10. The claimant has not been under a disability, as defined in the Social Security Act, since February 3, 2014, the date the application was filed.

AR at 20-33.

## VI. ISSUES ON APPEAL

The principal issues on appeal are:

1. Did the ALJ err in evaluating the medical opinion evidence?

2. Did the ALJ err in evaluating plaintiff's testimony?

Dkt. 11 at 1; Dkt. 12 at 1.

## VII. DISCUSSION

A. <u>The ALJ Erred Evaluating the Medical Opinion Evidence</u>

*1. Standards for Reviewing Medical Evidence*

As a matter of law, more weight is given to a treating physician's opinion than to that of a non-treating physician because a treating physician "is employed to cure and has a greater

---

[2] The actual date is deleted in accordance with Local Rule CR 5.2, W.D. Washington.

opportunity to know and observe the patient as an individual." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989); *see also Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007). A treating physician's opinion, however, is not necessarily conclusive as to either a physical condition or the ultimate issue of disability, and can be rejected, whether or not that opinion is contradicted. *Magallanes*, 881 F.2d at 751. If an ALJ rejects the opinion of a treating or examining physician, the ALJ must give clear and convincing reasons for doing so if the opinion is not contradicted by other evidence, and specific and legitimate reasons if it is. *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1988). "This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Id.* (citing *Magallanes*, 881 F.2d at 751). The ALJ must do more than merely state his/her conclusions. "He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citing *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988)). Such conclusions must at all times be supported by substantial evidence. *Reddick*, 157 F.3d at 725.

The opinions of examining physicians are to be given more weight than non-examining physicians. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Like treating physicians, the uncontradicted opinions of examining physicians may not be rejected without clear and convincing evidence. *Id.* An ALJ may reject the controverted opinions of an examining physician only by providing specific and legitimate reasons that are supported by the record. *Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir. 2005).

Opinions from non-examining medical sources are to be given less weight than treating or examining doctors. *Lester*, 81 F.3d at 831. However, an ALJ must always evaluate the opinions from such sources and may not simply ignore them. In other words, an ALJ must evaluate the opinion of a non-examining source and explain the weight given to it. Social

Security Ruling ("SSR") 96-6p, 1996 WL 374180, at *2. Although an ALJ generally gives more weight to an examining doctor's opinion than to a non-examining doctor's opinion, a non-examining doctor's opinion may nonetheless constitute substantial evidence if it is consistent with other independent evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *Orn*, 495 F.3d at 632-33.

### 2. *Dr. Ratcliffe*

Allen Ratcliffe, Ph.D., performed a psychological consultative evaluation of plaintiff on behalf of DSHS in December 2013, and concluded that plaintiff had a number of marked limitations in functioning. AR at 279-83. Dr. Ratcliffe identified plaintiff's symptoms as including "apparently involuntary tics during moments of stress while being interviewed," although they were "apparently minor in this setting, which Mr. Dufresne described as not very stressful when I asked about the tics. However, by his verbal report, quite intense if anxious, late, or if routine is disrupted." AR at 280. Dr. Ratcliffe further noted a constricted affective expression, marked to severe depression, and marked to severe anxiety. AR at 280.

On mental status examination, plaintiff presented as a markedly obese male dressed with "below average" hygiene as he was unshaven with uncombed hair. AR at 282. His speech was hesitant, circumstantial, at times intense and compulsive in quality. AR at 282. However, he was "fully cooperative with interview, general behavior is within normal limits . . . minor tics are observed at times throughout interview." AR at 272. Plaintiff's mood was dysphoric, and his affective expression "restricted in range but marginally adequate when not stressed." AR at 283. His thought process, memory, and fund of knowledge were not within normal limits, and he could perform only two steps of a simple three-step task. AR at 283. However, Dr. Ratcliffe noted that he was fully oriented, had no evidence of psychosis, normal concentration, and normal insight and judgment. AR at 283.

Following his clinical interview and mental status examination, Dr. Ratcliffe opined that plaintiff had numerous marked limitations in his ability to understand, remember and persist in tasks by following detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances without special supervision; perform routine tasks without special supervision; adapt to changes in a routine work setting; communicate and perform effectively in a work setting; maintain appropriate behavior in a work setting; complete a normal work day and work week without interruptions from psychologically based symptoms; and set realistic goals and plan independently.  AR at 282.  Dr. Ratcliffe diagnosed Asperger's Disorder (high functioning autism spectrum), Tourette's Disorder, and Bipolar II Disorder.  AR at 280.  However, he noted that "I am unable to provide adequate specialized evaluation to confirm Asperberger's or Tourette's Disorders.  I do see behaviors consistent with either of those diagnoses during this interview."  AR at 280.  He assessed a GAF score of 48.[3]  Dr. Ratcliffe noted that "with this combination of reported disorders, Mr. Dufresne is likely to experience permanent social and vocational impairment."  AR at 282.  However, he also recommended that plaintiff "first be evaluated by specialists in diagnosis and treatment of Tourette's Syndrome and High-Functioning Autism Spectrum

---

[3] The GAF score is a subjective determination based on a scale of 1 to 100 of "the clinician's judgment of the individual's overall level of functioning."  AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32-34 (4th ed. 2000).  A GAF score falls within a particular 10-point range if either the symptom severity or the level of functioning falls within the range.  *Id.* at 32.  For example, a GAF score of 51-60 indicates "moderate symptoms," such as a flat affect or occasional panic attacks, or "moderate difficulty in social or occupational functioning."  *Id.* at 34.  A GAF score of 41-50 indicates "[s]erious symptoms," such as suicidal ideation or severe obsessional rituals, or "any serious impairment in social, occupational, or school functioning," such as the lack of friends and/or the inability to keep a job.  *Id.*

Disorders, who can then develop with him an appropriate vocational services plan." AR at 282.[4]

The ALJ rejected Dr. Ratcliffe's opinion. AR at 26-27. Specifically, the ALJ noted that plaintiff "self-reported Tourette's and possible Asperger's, bipolar, schizophrenia or ADHD." AR at 26. The ALJ observed that although Dr. Ratcliffe diagnosed plaintiff with Asperger's, Tourette's and bipolar II, "the doctor further noted he was unable to provide adequate specialized evaluation to confirm Asperberger's or Tourette's disorders. He reported he saw behavior consistent with either during the interview, without explaining what the behavior was or how there was any similarity between the two disorders." AR at 27. The ALJ gave "little weight to the opinion" because "[w]hile the claimant had some abnormal findings upon exam, he also had some normal findings. The severity of the doctor's findings are inconsistent with the claimant's reported goal of returning to school, and his ability to engage in a wide range of daily activities." AR at 27. Finally, the ALJ noted that "Doctor Ratcliffe did not have the opportunity to review the longitudinal record of evidence to form a comprehensive opinion of functioning." AR at 27.

Plaintiff "does not dispute the ALJ's rejection of Dr. Ratcliffe's diagnosis of autism, given that it was provisional, or of his diagnosis of bipolar disorder, since he found that Mr. Dufresne suffered from severe ADHD, major depressive disorder, anxiety disorder, and Tourette's syndrome, which could also account for his symptoms and limitations. Dkt. 11 at 5. However, plaintiff argues that the ALJ's reason for rejecting Dr. Ratcliffe's marked functional limitations based upon the fact that plaintiff "had some normal and some abnormal findings on examination" was "impermissibly vague." Dkt. 11 at 5. Although the ALJ also

---

[4] He further recommended that plaintiff continue taking his antidepressant medication, and participate in a sleep study to confirm or rule out a sleep disorder. AR at 282.

1  rejected his opinion based upon plaintiff's ability to engage in a wide range of daily activities,

2  plaintiff contends that "the ALJ did not specify what these were or how they contradicted Dr.

3  Ratcliffe's opinion." Dkt. 11 at 6. Plaintiff points out that Mr. Dufresne was homeless at the

4  time of the evaluation, and during the day he visited a lake and napped, and then went to the

5  library until it closed for the day to read and use his laptop. AR at 280. Later, plaintiff went to

6  the YMCA in the morning for shelter and to follow his doctor's recommendation that he

7  exercise. AR at 480.

8      With respect to the ALJ's finding that Dr. Ratcliffe's opinion was inconsistent with

9  plaintiff's reported goal of returning to school because he was interested in using

10  nanotechnology to build white cells, AR at 279, plaintiff contends that his "aspirations were

11  not grounded in reality, as his history of poor academic performance, particularly in math, and

12  later psychological testing demonstrates." Dkt. 11 at 7 (citing AR at 368). As plaintiff points

13  out, the ALJ himself found that plaintiff would have difficulty recalling and performing novel

14  complex or detailed tasks, AR at 23, and therefore it was unreasonable for the ALJ to make

15  such a finding and yet discount plaintiff's opinion as inconsistent with plaintiff's educational

16  aspirations. Dkt. 11 at 7. Finally, plaintiff argues that the ALJ's rejection of Dr. Ratcliffe's

17  opinion because he did not have the opportunity to review the longitudinal record to form a

18  comprehensive opinion of plaintiff's functioning, AR at 27, is overly vague and unsupported

19  by the evidence, especially because the ALJ relied on the opinion of a different consultative

20  examiner, Dr. Allison, who had no greater knowledge of the "longitudinal record" than Dr.

21  Ratcliffe. Dkt. 11 at 7.

22      The Court finds that the ALJ failed to provide specific and legitimate reasons,

23  supported by substantial evidence, for rejecting Dr. Ratcliffe's opinion. First and foremost, the

24  ALJ's rejection Dr. Ratcliffe's opinion because "while the claimant had some abnormal

findings upon exam, he also had some normal findings" does not meet the level of specificity required by the Ninth Circuit.  The Ninth Circuit has held that "to say that medical opinions are not supported by sufficient objective findings . . . does not achieve the level of specificity our prior cases have required, even when the objective factors are listed seriatim.  The ALJ must do more than offer his conclusions.  He must set forth his own interpretations and explain why they, rather than the doctors' are correct." *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988).

Here, it is not at all clear which objective findings on mental status examination the ALJ considered significant, and why.  As noted above, plaintiff had numerous abnormal findings during his mental status examination, many of which appear quite significant, but the ALJ did not explain why he did not consider these abnormal findings to be reliable, or why they failed to support the marked limitations assessed by Dr. Ratcliffe.   For example, Dr. Ratcliffe noted that plaintiff's "thought process and content" were not normal, because plaintiff "reported definite obsessional thinking."  AR at 283.  Plaintiff also reported "that around 2007 he experienced an episode he described as "ghost images of vehicles driving at me." AR at 283.  Although he was oriented, did not have active psychosis, and his immediate memory was intact, he was unable to recall three words after five minutes.  AR at 283.  He also could only carry out two steps of a simple three-step task.  AR at 283.  His fund of knowledge was also inadequate.  AR at 283.  Just as the ALJ did not explain why he did not credit plaintiff's abnormal findings, the ALJ also did not explain how or why the normal mental status examination findings conflicted with the marked limitations assessed by Dr. Ratcliffe.  AR at 27.[5]

_____

[5] The Commissioner attempts to offer such an explanation.  Dkt. 12 at 2.  Specifically, the Commissioner argues that plaintiff's normal limits in the areas of orientation, perception,

The ALJ's other reasons for rejecting Dr. Ratcliffe's opinion were also not specific and legitimate, and supported by substantial evidence. As plaintiff points out, the fact that plaintiff *wanted to* return to school to study nanotechnology, engineering or biotechnology, AR at 279, does not mean that plaintiff was capable of doing so. AR at 368 (describing plaintiff's "significant difficulty" with coursework and "couple of nervous breakdowns" during his schooling). This was not a valid reason for the ALJ to reject Dr. Ratcliffe's opinion. AR at 27. Dr. Ratcliffe did not opine that plaintiff was inherently incapable of work, but stated that he needed to meet with specialists "who can then develop with him an appropriate vocational services plan" that may help him address his limitations. AR at 282. The ALJ, however, also found that plaintiff would struggle with recall and performance of novel and complex or detailed tasks, AR at 23, and it is unclear how to square this finding with the ALJ's reliance on plaintiff's educational aspirations.

Similarly, the ALJ inadequately explained how plaintiff's daily activities contradicted Dr. Ratcliffe's opinion. AR at 27. Plaintiff was homeless at the time of Dr. Ratcliffe's evaluation, sleeping in a shelter in Tacoma which he had to leave between 7:00 a.m. and 8:00 p.m. AR at 280. During the day, plaintiff napped at a lake until 11:00 a.m., when he went to the library to read or use his laptop until it closed. AR at 280. Later, plaintiff went to the YMCA (instead of the lake) in the morning for shelter and to follow his doctor's recommendation that he exercise. AR at 480. It is unclear how any of these activities, which

---

concentration, insight and judgment "conflicted with Dr. Ratcliffe's conclusion that, for example, he would have marked difficulty performing tasks without special supervision." Dkt. 12 at 2 (citing AR at 27, 281, 283). However, the ALJ did not make this specific findings, and therefore the Commissioner's argument is a post hoc rationalization. *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003) (holding that a reviewing court is constrained to review the reasons the ALJ asserted in his decision); *Pinto v. Massanari*, 249 F.3d 840, 847-48 (9th Cir. 2001) (it was error for the district court to affirm the ALJ's credibility decision based on evidence the ALJ did not discuss).

largely relate to plaintiff's homelessness and pursuit of shelter throughout the day, translate to work activities or contradict Dr. Ratcliffe's opinion.

Finally, the ALJ rejected Dr. Ratcliffe's opinion because he did not have the opportunity to review the longitudinal record to form a comprehensive opinion of plaintiff's functioning. AR at 27. An ALJ may consider "the extent to which a medical source is familiar with other information" in a case record in deciding what weight to give that medical opinion. *See* 20 C.F.R. § 416.927(c)(6). Without more, however, this was not a sufficient reason to reject Dr. Ratcliffe's opinion. Apart from additional testing, which Dr. Ratcliffe acknowledged needed to be done to confirm his initial diagnoses, it is not clear what other evidence the ALJ believed Dr. Ratcliffe was missing.[6] Plaintiff self-reported his struggles with ADHD, depression, anxiety, and Tourette's/autism symptoms, as well as his struggles with homelessness and job loss to Dr. Ratcliffe. The ALJ also relied on the opinion of another consultative examiner, Dr. Allison, who presumably was not any more familiar with the "longitudinal record" than Dr. Ratcliffe.

Accordingly, the Court finds that the ALJ failed to provide any specific and legitimate reasons, supported by substantial evidence, for rejecting Dr. Ratcliffe's opinion. This error was not harmless, because if the marked limitations assessed by Dr. Ratcliffe had been adopted by the ALJ, this would preclude competitive work on a regular and sustained basis. The vocational expert testified that an individual who required special supervision to perform repetitive work would not be able to perform competitive work. AR at 68-69. Similarly, a person who is off task, not able to fulfill production because of distractibility, or who distracted

---

[6] Again, although the Commissioner suggests that Dr. Ratcliffe's "lack of familiarity with . . . Plaintiff's work activity during the period at issue" was a valid reason for the ALJ to reject his opinion, this was not a reason given by the ALJ in his decision. AR at 27.

coworkers, could not be successfully employed.  AR at 67-70.  As a result, this case must be reversed and remanded for a *de novo* hearing and re-evaluation of the medical opinion evidence in this case, including Dr. Ratcliffe's opinion.

### 3.    Dr. Colby

On two occasions, Dr. Colby reviewed selected medical evidence on behalf of DSHS, and concluded that plaintiff was disabled apparently based on the findings of Dr. Ratcliffe.  AR at 284, 287-89.  The ALJ found that "for the same reasons Dr. Ratcliffe's opinion is given little weight, I give little weight to the vague forms completed by Faulder Colby, Ph.D., based on Dr. Ratcliffe's report."  AR at 27.  The ALJ noted that "Dr. Colby did not personally examine the claimant and did not review the longitudinal record."  AR at 27.

Because the reasons given by the ALJ for rejecting Dr. Ratcliffe's opinion were not specific and legitimate, the Court finds that they are also an insufficient basis to reject Dr. Colby's opinion.  On remand, the ALJ should reexamine Dr. Colby's opinions.

### 4.    Dr. Covell

Psychologist Christmas Covell, Ph.D., examined plaintiff in March 2014 for DSHS.  '  AR at 27-28, 366-377.  Dr. Covell performed an adult complex psychological assessment, including administering the Wechsler Adult Intelligence Scale ("WAIS-IV"), the Wechsler Memory Scale ("WSM-IV"), and the Trail Making Test.  AR at 366.  During the clinical interview, plaintiff provided a similar history and description of his symptoms as he gave to Dr. Ratcliffe, with more detail about his mood swings, depressive episodes, anxiety, Tourette's symptoms, and concerns that he may have autism based on his fixations, rigid thinking, and social limitations.  AR at 368-70.  During the mental status examination, Dr. Covell noted that plaintiff was friendly, cooperative, and made appropriate eye contact, but appeared restless and fidgeted throughout the assessment.  His speech was over-productive, his thought processes

circumstantial and tangential, he was highly distractible (frequently losing his train of thought and requiring interruption, redirection, and repetition to remain focused), and his insight was poor. AR at 371. His concentration was variable and delayed memory was impaired. AR at 372. He scored in the below average range on the Montreal Cognitive Assessment, indicating cognitive difficulty or impairment. AR at 372. Most notable were plaintiff's memory scores, which were significantly impaired. AR at 375. Dr. Covell found that plaintiff put forth good effort on testing and his scores were valid. AR at 373.

Dr. Covell diagnosed plaintiff with ADHD, persistent depressive disorder (with pure dysthymic syndrome), and unspecified anxiety disorder. AR at 376. She opined that plaintiff "appears capable of understanding, recalling and carrying out simple tasks and instructions, as well as routine and familiar semi-complex tasks. He is anticipated to have considerable difficulty with recall and performance of novel complex or detailed tasks, or following lengthy and detailed instructions, particularly if these are delivered in an exclusively auditory format." AR at 377. She further opined that plaintiff "demonstrates significant distractibility and is likely to have difficulty with remaining adequate concentration with work tasks without external structure/supports, particularly those that are sedentary and repetitive." AR at 377. She noted that "[d]ifficulty with motivation and procrastination associated with depressive symptoms, as well as varying attention and distractibility are likely to significantly impact his pace of performance, as well as timely completion of tasks/projects and persistence though a workday . . . he demonstrates inattentiveness in conversation, as well as a tendency to lose his train of thought, go off on tangents, to interrupt or talk over others, and to talk somewhat excessively, which may be poorly tolerated/inappropriate and distracting to others in some work settings." AR at 377. Finally, Dr. Covell noted that he "appears to have difficulty with anxiety and irritability with unexpected events and to struggle with adapting to change, and

will likely require clear and consistent work settings, tasks, expectations to perform adequately and avoid argumentative or irritable verbal exchanges with others." AR at 377.

The ALJ gave Dr. Covell's opinion only partial weight. AR at 27-28. The ALJ adopted Dr. Covell's opinion that plaintiff "can do simple tasks, routine and familiar semi-complex tasks with limits on public interaction because it was based on a review of the claimant's medical records, testing, and an in-person examination. The opinion was supported by and consistent with clinical findings such as an average IQ." AR at 28. However, the ALJ gave no weight "to the portion of the opinion [finding] the claimant needs external support or structure. The evidence shows the claimant is able to engage in a wide range of tasks on a regular basis to care for himself and obtain services, without external support or structure." AR at 28.[7] Moreover, the ALJ pointed out that plaintiff was not taking any medication to treat his depression or ADHD, although the ALJ believed "the overall evidence shows that with treatment he could function without needing any type of external support and reduce his distractibility issues." AR at 28. Finally, the ALJ found that "the claimant's motivation to work out for hours daily, like doing repetitive activities, suggest he is capable of self-motivation to work." AR at 28.

The Court finds that the ALJ's reasons for rejecting aspects of Dr. Covell's opinion were not specific, legitimate, or supported by substantial evidence. It is unclear why the ALJ found certain aspects of Dr. Covell's opinion to be supported by her review of the medical

---

[7] The ALJ also noted that plaintiff "reads and uses the computer. He has some minimal interaction with others, but regularly communicates online." AR at 28. The ALJ does not explain how plaintiff's ability to read and use a commuter to communicate with others relates to Dr. Covell's opinion. Indeed, this tendency would appear to support Dr. Covell's opinion that plaintiff can have some difficulty relating face-to-face with other people, preferring instead to communicate over the internet. On remand, the ALJ should better explain his meaning, if he finds that plaintiff's ability to read and use the computer somehow contradicts Dr. Covell's opinion.

records, extensive testing, and in-person examination, but other aspects not to be. As discussed above, the Court is not persuaded that plaintiff's activities as a homeless person moving from his overnight shelter to places he uses effectively as a daytime shelter (the public library and YMCA being two primary examples) constitute a "wide range of tasks on a regular basis to care for himself and obtain services, without external support or structure." AR at 28. As plaintiff points out, the ALJ's finding ignores the fact that all the services plaintiff was receiving are a form of external/support structure for someone who requires assistance to care for his own basic needs. Catholic Community Services arranged for his transportation, plaintiff was sleeping in shelters, and being fed by food banks. The ALJ's reasoning is troubling and invalid.

The ALJ also found that "the claimant's motivation to work out for hours daily, like doing repetitive activities, suggest he is capable of self-motivation to work." AR at 28. AR at 28. The Court is not persuaded that plaintiff's ability to exercise and spend hours at the YMCA is inconsistent with Dr. Covell's opinion that plaintiff needs external support or structure, and has social limitations and/or adaptive limitations. The ALJ's finding also disregards the fact that the YMCA was serving as a "daytime shelter" for plaintiff, and providing a safe place where he could care for his personal hygiene. Plaintiff's attempts to work out at the YMCA, consistent with his medical providers' repeated recommendations that he exercise and lose weight to treat his obesity and related health conditions, AR at 25, does not necessarily translate to sufficient self-motivation and ability to work on a full-time basis.

Finally, the ALJ's rejection of Dr. Covell's opinion because plaintiff was not taking medication for his depression or ADHD is not specific and legitimate, in light of the evidence that plaintiff was unable to afford and access treatment at times or tolerate the side effects of his medication while he stayed in a homeless shelter. AR at 279-80, 368. For example,

plaintiff has explained his reluctance to take his ADHD medication, Ritalin, because it triggered his Tourette's symptoms in the past. AR at 279. Plaintiff also explained to Dr. Covell that he "is supposed to be on Effexor but living in the shelter I can't take it . . . it makes me sleep to mud and when I was taking it I almost lost my bed there." AR at 368. SSR 96-7p provides that in evaluating a plaintiff's credibility (or testimony), "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." Here, although the ALJ was evaluating Dr. Covell's opinion rather than plaintiff's testimony, the ALJ nevertheless unreasonably failed to consider or discuss plaintiff's explanations for his failure to maintain medication management during the period at issue, including his time at the homeless shelter. Instead, the ALJ concluded that "with treatment he could function without need any type of external support and reduce his distractibility issues." AR at 28. Because the ALJ failed to discuss plaintiff's explanations, which appear throughout the record, the ALJ's finding was unreasonable.

Accordingly, the ALJ erred by failing to provide legally sufficient reasons for rejecting Dr. Covell's opinion that plaintiff would require external support and structure to function in a workplace environment. The Social Security regulations provide that work performed under special conditions or with special supervision may not constitute substantial gainful activity, and the vocational expert testified that an individual who needs special supervision to do repetitive work could not perform competitive work. AR at 68-69. Thus, the ALJ's error in evaluating Dr. Covell's opinion was harmful.

### 5. Dr. Eather

State agency non-examining psychologist Bruce Eather adopted Dr. Covell's opinion that plaintiff needed external support or structure to work in rendering his opinion. AR at 83. Although Dr. Eather found plaintiff capable of performing simple tasks, routine and some familiar semi-complex tasks, he found that plaintiff "is likely to have difficulty with maintaining adequate concentration for work tasks without external structure/supports, particularly those that are sedentary or repetitive." AR at 83. The ALJ adopted the portion of Dr. Eather's opinion finding him capable of work, and rejected the portion of Dr. Eather's opinion requiring external structure and support. AR at 31. The ALJ noted that "this is not supported by any of the claimant's daily activities or regular daily routines. Subsequent evidence shows there was some inconsistent performances at exams, and the claimant's residual functional capacity reasonable considers his mental conditions." AR at 31. As discussed above with respect to Drs. Ratcliffe and Covell, plaintiff's daily activities and daily routines are not a specific and legitimate reason to reject Dr. Eather's opinion. The ALJ also fails to explain what "inconsistent performance at exams" he believes undermined Dr. Eather's conclusion. The ALJ's reasons for rejecting Dr. Eather's opinion, like the opinions of Drs. Ratcliffe and Covell, are not specific, legitimate, or supported by substantial evidence.

In light of the ALJ's harmful errors in evaluating the medical opinions above, it is unnecessary for the Court to evaluate the remaining assignments of error in this case. As noted above, the ALJ shall conduct a *de novo* review of all the medical opinion evidence in this case, in light of the direction provided by this Order. In particular, the ALJ shall more carefully consider the fact that plaintiff is homeless, and certain daily activities necessarily stem from his homelessness. In short, plaintiff's ability to spend time and entertain himself at the library and YMCA during the day, when he is not allowed to stay at the homeless shelter where he sleeps,

does not constitute "a wide range of physical and mental activities" that evince an ability to engage in full-time work. *See e.g.,* AR at 24. This erroneous assumption permeates the ALJ's entire written decision, and his evaluation of the medical opinion evidence. On remand, the ALJ shall also refrain from finding that plaintiff's ability to practice a religion demonstrates "concentration, persistence, and pace" for work activity, as the Court finds such a conclusion unwarranted. AR at 26 ("The claimant reported around his application date that he practices a Viking religion . . . suggesting some concentration, persistence, and pace for this activity.").

      B.    <u>On Remand, the ALJ Shall Re-Evaluate Plaintiff's Testimony</u>

Here, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms. However, I do not find the allegations fully credible." AR at 24. Because this case is being remanded for reconsideration of all the medical evidence, and the Court has found that credibility determinations are inescapably linked to conclusions regarding medical evidence, 20 C.F.R. § 404.1529, the ALJ's credibility finding is also reversed and the issue remanded. After re-evaluating the medical evidence, the ALJ should reassess plaintiff's testimony, and provide clear and convincing reasons for rejecting it should such a conclusion be warranted.

VIII.   CONCLUSION

For the foregoing reasons, this case is REVERSED and REMANDED to the Commissioner for further proceedings not inconsistent with the Court's instructions.

DATED this 17th day of August, 2017.

*James P. Donohue*
_____
JAMES P. DONOHUE
Chief United States Magistrate Judge